Stanley WILLIAMS, Petitioner,

v.

Arthur CALDERON, Warden of California State Prison at San Quentin, Respondent.

No. CV 89–327–SVW.

United States District Court, C.D. California.

Dec. 21, 1998.

Maria E. Stratton, C. Renee Manes, Federal Public Defenders Office, Los Angeles, CA, for petitioner.

Emilio Eugene Varanini, IV, CAAG-Office of Attorney General of California, Los Angeles, CA, for respondent.

## ORDER DENYING HABEAS RELIEF ON CLAIMS A, B, D, Q, AND R

### *DEATH PENALTY*

WILSON, District Judge.

On January 23, 1989, petitioner Stanley Williams filed a federal petition for a writ of habeas corpus. Respondent filed an answer on March 3, 1989. Petitioner was ordered to return to state court for exhaustion and the Court held the federal proceedings in abeyance pending completion of the state proceedings.

After the state court denied the unexhausted claims, petitioner filed an amended federal petition on November 13, 1995. Respondent filed an answer to the amend-

ed petition on February 10, 1997, and filed a motion for summary judgment on April 7, 1997. On March 26, 1998, the Court granted the motion for summary judgment on the majority of the claims in the petition. The Court also ordered an evidentiary hearing on Claims B, Q, and R.

The evidentiary hearing was held on May 27 and 28, 1998. Direct testimony was taken by narrative statement. The Court also heard live testimony from petitioner's trial attorney, another attorney who represented petitioner at the preliminary hearing, and a trial juror. The parties wanted to present the testimony of several mental health experts on the issue of petitioner's mental state at the time of the offenses. Instead, the Court ordered the parties to cross-examine the experts by deposition and file briefs detailing areas of possible impeachment.

On June 2, 1998, both parties filed briefs regarding anticipated areas of cross-examination. On June 22, 1998, the parties lodged the depositions of the mental health experts. On July 1, 1998, petitioner filed a brief following the depositions of the experts and a request to renew the evidentiary hearing to present the testimony of the mental health experts. On July 24, 1998, respondent filed a response to petitioner's brief.

### Background

The Court's Order on respondent's Motion for Early Summary Judgment/Adjudication contains a complete factual and procedural background. The Court will not repeat it here.

### Analysis:

### I. CLAIM B: SHACKLING

Petitioner argues that his constitutional rights were violated because he was shackled without permissible justification and necessity. (Pet. at 15.) He claims he was shackled during the trial and that the shackles were visible to jurors. He also alleges that his attorney failed to object to the restraints.

### A. *Evidence Presented Regarding Shackling*

Juror Jo–Anne Kellick stated in a declaration submitted by petitioner that he, "was handcuffed from the beginning of trial until its end. I recall the handcuffs because I remember wondering how they could find cuffs which could fit around his wrists. I could see these restraints whenever Mr. Williams' hands were visible." (Evidentiary Hearing Exhibit ["Ex."] 81.)

Respondent also filed a declaration by Juror Kellick in which she stated that she did not see petitioner in leg irons or shackles. However, she assumed that he was restrained because she never saw him come and go. She also had a vague memory of seeing him in handcuffs once, but she had vivid memories of seeing him without handcuffs many times. (Exhibit I to Written Statements of Direct Testimony of Respondent's Witnesses for May 26, 1998 Evidentiary Hearing ["Respondent's Direct"].)

Juror Lawrence Raines testified at the evidentiary hearing that he saw petitioner with his hands held together in front of him with a jacket over his hands. Although Mr. Raines did not recall ever seeing the handcuffs, he assumed that petitioner was handcuffed. (Evidentiary Hearing Transcript ["EH"] 236–37.) It was unclear from Raines's testimony how many times he saw petitioner this way.

Juror Mary Fehr stated that she saw no restraints on petitioner during trial. (Exhibit B to Respondent's Direct.)

The bailiff during petitioner's trial, Deputy Tom Jones, stated that petitioner was not handcuffed in front of the jury. However, he did have a leg chain on his ankles as he sat in court. He was brought into the courtroom and seated before the jury entered the courtroom, and he was not allowed to stand until the jury left. Petitioner's feet and legs were hidden from the jury by counsel tables, therefore, the jurors would not have been able to see the leg chain during trial. Jones stated that

the trial judge, Judge Hinz, authorized the use of the leg chain. (Exhibit G to Respondent's Direct.)

## B. *Law Regarding Shackling*

■ A criminal defendant has a constitutional right to appear before a jury free of restraints such as shackles. *Jones v. Meyer*, 899 F.2d 883, 884 (9th Cir.1990). This right is grounded both on the presumption of innocence and due process. *Duckett v. Godinez*, 67 F.3d 734, 747–48 (9th Cir.1995). The use of restraints has several inherent disadvantages: physical restraints may cause jury prejudice and impair the presumption of innocence; they may detract from the dignity and decorum of the courtroom; they may impede the defendant's ability to communicate with his counsel; they may confuse and embarrass the defendant; and they may cause pain. *Id.*

■ The right to appear before a jury free of shackles is not absolute. Shackling is inherently prejudicial, but it is not per se unconstitutional. *See Spain v. Rushen*, 883 F.2d 712, 716 (9th Cir.1989). "Under certain circumstances, 'shackling ... may be appropriate because of the public's competing interest in courtroom security and the just administration of law.'" *Duckett*, 67 F.3d at 748 (quoting *Rushen*, 883 F.2d at 722). However, "it is a denial of due process if a trial court orders a defendant shackled without first engaging in a two-step process. First, the court must be persuaded by compelling circumstances that some measure is needed to maintain security of the courtroom. Second, the court must pursue less restrictive alternatives before imposing physical restraints." *Id.* at 748 (internal quotations and citations omitted).

■ There is no information in the state court record regarding the shackling. There is no indication that the issue was ever discussed by counsel and the trial court. There is no evidence that the trial court ordered petitioner to be shackled. There is no record that defense counsel objected to the shackling.[1] Consequently, the trial court did not articulate its reasons for allowing petitioner to remain shackled and it is unclear whether any less restrictive alternatives were available and would have been adequate.

■ The trial court is not required to state on the record its reasons for imposing shackles nor must it conduct a hearing before ordering the use of restraints. However, "the basis for the decision to shackle should be apparent from the record. If it is not, the [habeas] court must hold an evidentiary hearing to determine whether shackling was justified." *Duckett*, 67 F.3d at 749 n. 7.

■ Although the effect of shackles has been described as "inherently prejudicial," the actual prejudice will vary depending on the degree of restraint. *Id.* at 749. The ultimate question is whether the shackling "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

## C. *Conclusion*

Based on the evidence presented at the evidentiary hearing, the Court finds that petitioner's legs were restrained during trial. Although the state court record is devoid of any evidence that the trial court held a hearing to determine whether the leg chain was necessary, Deputy Jones stated that petitioner wore a leg chain during trial. Deputy Jones provided the most detailed testimony regarding the use of restraints, therefore, the Court accepts his testimony. In addition, the Court finds that one juror saw petitioner with a jacket

---

1. Although trial counsel's failure to object may be evidence that the shackling was warranted or not prejudicial, the failure to object does not preclude the Court from addressing the claim. *See Wilkerson v. Whitley*, 16 F.3d 64, 67–68 (5th Cir.1994) (shackling claim addressed on the merits even though counsel failed to object); *Harrell v. Israel*, 672 F.2d 632, 634 (7th Cir.1982) (same).

draped over his hands at least once. Otherwise, petitioner's hands were not restrained during trial.

■ The use of a leg chain and handcuffs was not justified. There is no evidence of obstreperous or assaultive behavior by petitioner and no real evidence that he was an escape risk except for the conversations with Oglesby that occurred a year before trial started. The fact that petitioner was on trial for murder, that he was a gang member, and that he was extremely muscular does not justify the use of restraints. The trial court did not hold a hearing on the shackling issue and there is no evidence that it considered less restrictive alternatives.

■ Although the use of restraints was improper, the error was harmless. *See Castillo*, 983 F.2d at 149 (shackling at trial held harmless because the defendant wore only a waist chain which could not be seen by the jury). The use of the leg chain in this case implicated none of the inherent problems raised by shackling. *See Duckett*, 67 F.3d at 747–48. The leg chain did not impair the presumption of innocence or prejudice the jury against petitioner because the jury never saw it. The leg chain did not detract from the dignity and decorum of the courtroom because it was not visible. Petitioner's ability to communicate with counsel was not impeded because his hands were not restrained during trial. Finally, there is no evidence that the leg chain caused any pain or discomfort.

Any error in the use of handcuffs was also harmless. The Court finds that Juror Raines saw petitioner standing with a jacket over his hands. There is no evidence this occurred more than once. The most logical conclusion from this evidence is that Raines saw petitioner in handcuffs as he was being taken to or from the courtroom which is less prejudicial than if he had been restrained in front of the jury during the entire trial. *See Castillo*, 983 F.2d at 148 (holding shackling harmless where several members of the jury pool saw the petitioner in shackles in a hallway). The fact that petitioner's hands were covered by a jacket also helped to minimize the possible prejudice. *See Jones*, 899 F.2d at 885. In addition, there is no evidence that Raines discussed what he saw with other jurors.

The Court finds that no other juror saw petitioner in handcuffs. Juror Fehr testified that she never saw petitioner in handcuffs. Deputy Jones stated that petitioner did not appear in front of the jury in handcuffs. Juror Kellick stated in one declaration that she saw petitioner in handcuffs throughout the entire trial. However, the Court gives no weight to this testimony because it is contradicted by her later declaration and is at odds with the other evidence presented on this issue.

■ The fact that one juror saw petitioner with a jacket over his hands as he was being brought to or taken from the courtroom on one occasion did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638, 113 S.Ct. 1710. Further, any failure by trial counsel to object to the shackling did not result in prejudice, therefore, the ineffective assistance of counsel subclaim is without merit. Based on the foregoing, Claim B is DENIED.

## II. CLAIMS Q AND R: TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT MITIGATING EVIDENCE

Petitioner's trial attorney, Joseph Ingber, presented no mitigating evidence at the penalty phase. The federal habeas petition contains lengthy, detailed allegations enumerating the evidence petitioner contends could have been presented. (Pet. at 61–71.) Petitioner claims Ingber unreasonably failed to uncover and present this evidence at the penalty phase.

### A. *Applicable Law*

■ Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular in-

vestigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel must "at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994). The Court must find that counsel either conducted a reasonable investigation or demonstrated a strategic reason for failing to do so. *Id.* However, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

Closely related to the duty to investigate potential evidence is counsel's duty to present the evidence he or she uncovers. To "fail to present important mitigating evidence in the penalty phase—if there is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir.1992). Presenting evidence of a defendant's background and character or mental impairments can be especially helpful because of "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring).

Petitioner must also establish prejudice as a result of counsel's alleged errors and omissions. Prejudice is shown when there is a reasonable probability that, absent the errors, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052.

### B. *Ingber's Decision not to Present Mitigating Evidence was Reasonable*

Ingber testified at the evidentiary hearing that he did not present mitigating evidence for three reasons: (1) petitioner was adamant that he did not want anyone to testify at the penalty phase; (2) Ingber did not believe the diminished capacity defense was viable; and (3) Ingber was worried that, if he presented mitigating evidence, the prosecution would be able to present evidence on rebuttal that petitioner was a member of the Crips, a notorious street gang. As discussed in detail below, Ingber's decision not to present mitigating evidence was reasonable.

### 1. Relevant Facts from the State Court Record

Before the penalty phase began, Ingber represented to the trial court that petitioner did not wish to present any mitigating evidence. The trial court asked petitioner if he wanted to testify to which he responded, "Hell no." (RT 2988–89.) Ingber told the trial court that a division had arisen between he and petitioner concerning the calling of witnesses at the penalty phase. Ingber then conferred with petitioner and indicated that he was shaking his head and that it was "his desire, his wish, that no other witnesses should be called in the penalty phase." (RT 2989.)

Ingber later indicated to the trial court that he had been advised by certain mitigation witnesses that other witnesses could be made available and that he wanted the court to consider the possibility of continuing the case so he could reach those witnesses. The court ruled that the request was premature. (RT 2992–93.)

Following a discussion of other issues, and after conferring with petitioner, Ingber stated, "[i]t's the defendant's desire that no one testify on his behalf in this phase; and I acquiesce to the desires of the defendant. So there will be no testimony called in this phase of the trial." (RT 2996.) The trial court addressed petitioner directly and strongly urged him to put on mitigating evidence. When the court asked petitioner if he had enough time to discuss the matter with counsel, he stood mute. (RT 2997.)

### 2. Petitioner Made an Informed Decision not to Present Mitigating Evidence

 Respondent contends that petitioner is not entitled to relief on this claim because he precluded Ingber from calling witnesses at the penalty phase. According to respondent, the state court record establishes that Ingber had witnesses who would have testified but petitioner did not want to present mitigating evidence. Petitioner argues that Ingber did not investigate potential mitigating evidence, did not understand and adequately explain the nature and scope of possible mitigating evidence, and that he told Ingber only that he did not want his mother or step-father to testify.

Petitioner's argument is supported by a declaration by Ingber wherein he stated that petitioner "said that he did not want his mother or stepfather to testify at the penalty phase and he would not testify either. Aside from this one matter, he put no other restrictions on my representation and did not try to interfere." (Ex. 12, ¶ 6.) On the other hand, the evidence in the state court record indicates that petitioner did not want to present any mitigating evidence. At trial, Ingber stated that it was petitioner's wish that "no other witnesses be called in the penalty phase," (RT 2989), and later stated that "[i]t's the defendant's desire that no one testify on his behalf in this phase." (RT 2996.)

At the evidentiary hearing, Ingber testified unequivocally that petitioner did not want anyone to testify at the penalty phase. (EH 69–70, 73, 129–30.) This prohibition was not limited to his mother and step-father, but included mental health experts and any other potential witness. (EH 70.)

Petitioner presented no evidence to controvert Ingber's testimony that petitioner made the decision not to present evidence at the penalty phase. Therefore, the Court finds that Ingber did not provide deficient performance by acquiescing to petitioner's decision not to present evidence at the penalty phase. *Gerlaugh v.*

*Stewart,* 129 F.3d 1027, 1034–35 (9th Cir. 1997); *Jeffries v. Blodgett,* 5 F.3d 1180, 1198 (9th Cir.1993); *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985).

The only remaining question is whether petitioner's decision was informed. Ingber testified that he discussed the purpose of mitigation evidence with petitioner and discussed what evidence could have been presented. (EH 276.) Petitioner presented no evidence to contradict Ingber's testimony that he was informed of the nature and scope of mitigating evidence. The trial court also informed petitioner that it was important for him to present evidence at the penalty phase. (RT 2996–97.) Therefore, the Court finds that, even assuming Ingber did not conduct an adequate penalty phase investigation, the failure to investigate is irrelevant because petitioner instructed Ingber not to present any penalty phase evidence. Petitioner's decision not to present mitigating evidence was informed and, under the circumstances, Ingber was not ineffective for failing to present mitigating evidence or for failing to investigate evidence that petitioner would not have allowed him to present.

The Court's conclusion ends the inquiry because trial counsel is not deemed ineffective for following his client's wishes. However, assuming petitioner did not preclude Ingber from presenting a diminished capacity defense at trial, the Court will also address the issue of whether Ingber's decision not to present a diminished capacity defense at the penalty phase was reasonable.

### 3. Ingber's Decision not to Present a Diminished Capacity Defense at the Penalty Phase was Reasonable

 Petitioner contends that Ingber's failure to present evidence of his mental impairments at the penalty phase constitutes ineffective assistance of counsel. He argues that brain damage, mental illness, head injuries, and drug abuse impaired his ability to premeditate, deliberate, form a

plan, and conform his conduct to the requirements of the law.

Ingber testified that he considered presenting a diminished capacity defense at the penalty phase, however, he did not believe such a defense was viable. He noted that it was, "[r]aiseable to the extent that there was a known history of PCP usage. There was a known history that the conduct itself was a bizarre conduct. There was some indications that psychiatrically that there was something out there." (EH 52.) He was aware of and considered the reports of Dr. Coodley and Dr. Coburn, who were appointed by the trial court to assess petitioner's sanity at the time of the crimes and his competency to stand trial. (EH 40.) He acknowledged that Dr. Coodley "passed upon" the possibility of a diminished capacity defense, however, he did not consult with Dr. Coodley because he did not consider Dr. Coodley a credible witness and did not believe his opinion was respected by the judiciary. (EH 41.) Ingber respected Dr. Coburn's opinion more than Dr. Coodley's and felt that Dr. Coburn's report did not support a diminished capacity defense. (EH 55–56.) In that report, Dr. Coburn stated,

> My preliminary impressions on the description of the materials at hand and the examination of the defendant would not indicate any support for defense position of insanity or diminished capacity, unless virtually all of the witness statements regarding both the defendant's behavior and his post-offense statements are discounted completely. There is really nothing in the data itself to support the likelihood that his behavior or thought patterns were materially affected by any PCP usage, even assuming that usage did occur.

(Ex. 61.)

Not only did Dr. Coburn's report convince Ingber that there was little or no evidence to support a diminished capacity defense, it essentially precluded him from raising it. If Ingber called Dr. Coodley to testify, he would have been required to disclose Dr. Coburn's report to the prosecution which Ingber felt did not support a diminished capacity defense. If Ingber had consulted and called a different mental health expert, the prosecution would have known that Dr. Coburn had been appointed and would have known inferentially why the defense did not call him. (EH 56–57.) The prosecution could then have subpoenaed Dr. Coburn to rebut the diminished capacity defense. Therefore, Ingber felt that he could not present mental health evidence without risking the introduction of rebuttal evidence from the prosecution.

Ingber also had to contend with a damaging report from Dr. Siegel. Although Ingber testified that he did not remember seeing Dr. Siegel's report, the Court can infer that he saw and considered it in preparing for trial. Dr. Siegel was retained by Ingber's predecessor, Henry Nelson. (EH 205.) Dr. Siegel's report was contained in Nelson's trial file which was given to Gerald Lenoir which was then given to Ingber. (EH 206.) It is reasonable to assume that Ingber reviewed the file given to him by Mr. Lenoir and that Ingber saw and considered Dr. Siegel's report.

Dr. Siegel is pharmapsychologist. (Ex. E to Respondent's Direct, ¶ 14.) Psychopharmacology is the study of the effects of drugs and mechanisms of drug action on the brain and behavior. Dr. Siegel interviewed petitioner in 1979 and rendered an opinion regarding his mental state at the time of the crimes. He stated that petitioner was "a violent, assaultive, and combative individual." (Ex. 68 at 2.) Although petitioner told Dr. Siegel that he abused PCP, he exhibited "none of the characteristic changes in perception and body imagery associated with chronic PCP users, suggesting that his use of this compound has been somewhat exaggerated or involves very low dosages." (Ex. 68 at 2.) Petitioner exhibited no signs of psychotic or schizophrenic thinking. He denied "paranoid ideation, visions or voices of the Devil attributed to him in Coodley report."

(Ex. 68 at 3.) Dr. Siegel concluded that, "[t]here is no indication of underlying psychopathology although he is extremely violent and assaultive." Dr. Siegel opined that petitioner "was neither insane, unconscious, nor severely diminished in capacity at the time of the alleged offense. He was capable of knowing and understanding the nature and quality of his acts and the consequences." (Ex. 68 at 4.)

Ingber made a tactical decision not to present a diminished capacity defense at the penalty phase. (EH 294.) Instead, he decided to capitalize on any lingering doubt the jury might have had regarding petitioner's guilt. (See RT 3055–56.) Based on the information contained in the reports of Drs. Coodley, Coburn, and Siegel, Ingber felt that a diminished capacity defense was not viable at the penalty phase and that the lingering doubt defense was a better strategy. In addition to the reports from the doctors, Ingber believed the facts of the crimes did not support a diminished capacity defense. He felt that the key to a successful diminished capacity defense was evidence of contemporaneous ingestion of drugs and evidence regarding the effect of the drugs on the defendant. (EH 134.) In this case, "there wasn't anyone who was going to testify that Mr. Williams was materially affected by the use of drug, PCP, that caused his activities on the evening in question to prevent him from having a specific intent to commit the robberies." (EH 135.) Although Alfred Coward testified that petitioner smoked PCP on the night of the 7–Eleven murder, his description of petitioner's actions did not support a conclusion that his capacity was substantially diminished. Ingber also felt he could not merely present evidence that petitioner had ingested PCP on the night of the murder because "there are people who say if he smoked sherms, he looks natural, he looks normal. You must be able to portray that it had a specific effect." (EH 63.)

Ingber's decision was reasonable. He could persuasively argue lingering doubt at the penalty phase. There were no eyewitnesses to the Brookhaven Motel murders and the only eyewitness to the 7–Eleven murder was an accomplice who had a strong motive to lie. The prosecution's case was based on circumstantial evidence and the testimony of witnesses whose credibility was highly suspect. The mental state evidence was weak and would have contradicted the lingering doubt defense. In addition, Ingber could argue lingering doubt at the penalty phase without presenting testimony to support the defense thereby eliminating a possible conflict with his client regarding the calling of witnesses. Based on the foregoing, the Court finds that Ingber made an informed, reasonable strategic decision to present a lingering doubt rather than diminished capacity defense at the penalty phase. "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland.*" *Gerlaugh,* 129 F.3d at 1033 (citation omitted). Petitioner has failed to establish deficient performance.

### C. *Petitioner Suffered No Prejudice*

The Court has found that Ingber's performance was reasonable, therefore, the Court need not address prejudice. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052. Nevertheless, the Court will analyze what evidence could have been presented by both parties at the penalty phase and whether petitioner suffered prejudice from Ingber's failure to present the diminished capacity defense at the penalty phase.

### 1. Evidence that Trial Counsel Could Have Been Presented

The following is a summary of the evidence that could have been presented had Ingber retained mental health experts to assess petitioner's mental state.

#### *Dr. George Woods*

Dr. Woods is a psychiatrist. In preparing the declaration which was filed as his direct testimony, Dr. Woods interviewed petitioner in 1993, reviewed documents relating to his medical and family history, and reviewed the results of psychological tests taken by petitioner. The purpose of

the evaluation was to determine petitioner's "mental status at the time of the offenses for which he is under a sentence of death, and to assess his mental functioning from the time of his arrest through trial, and to determine what factors influenced his behavior and functioning during his developmental years." (Ex. 69, ¶ 5.)

Dr. Woods detailed petitioner's family history in his declaration. Much of the information is irrelevant, for example, he noted that petitioner's maternal grandmother "was frail and suffered from arthritis during her child-bearing and child-rearing years." (Ex. 69, ¶ 10.) However, some of the information would have been relevant at the penalty phase. Dr. Woods discussed petitioner's relationship with his grandmother and how he was devastated when she died in 1976; he discussed the history of mental illness in petitioner's family; his mother's strange behavior; a childhood seizure; the numerous head injuries he suffered as a child; his abandonment by his father; the genesis of his reputation as a gang leader; his fanatical body-building; his hospitalization for gunshot wounds; and his drug abuse, mental impairment, and concurrent behavioral changes. (Ex. 69, ¶¶ 11–64.)

Dr. Woods concluded that petitioner "suffers from a serious psychiatric disorder with probable multiple etiologies." (Ex. 69, ¶ 78.) The disorder is characterized by depression and the symptomatology is consistent with Bipolar Disorder. Petitioner also suffers from brain damage in the right hemisphere, right parietal and temporal regions, and frontal lobe damage, as well as minimal left temporal lobe damage. Drug abuse likely exacerbated the effects of the mental illness. (Ex. 69, ¶ 87.)

Dr. Woods concluded that, because of his mental impairments, background, and drug abuse, petitioner "did not premeditate, deliberate, and meaningfully and maturely reflect upon the gravity of the acts at the time of the crimes for which he is charged." He opined that the "nature of [petitioner's] serious mental disorder and brain damage is such that his cognition, judgment, accurate perception of his surroundings, and impulse control were severely impaired, although his behavior may seem to be purposeful to lay observers or a professional who is not familiar with [petitioner's] long standing affective disorder." (Ex. 69, ¶ 94.)

### Dr. Karen Bronk–Froming

Dr. Froming is a neuropsychologist. She conducted an examination of petitioner which consisted of a battery of standard neuropsychological tests as well as a mental status exam and interview. The purpose of the testing was "to assess Mr. Williams' neuropsychological functioning and to determine the existence, if any, of specific cognitive defects that affected his behavior during his developmental years, the offense, and subsequent legal proceedings." (Ex. 65, ¶ 8.) Dr. Froming also reviewed various documents relating to petitioner, excerpts of the trial transcripts, police reports, and the statement of facts from the appellate briefing.

Dr. Froming noted that a complete mental assessment cannot be performed without a thorough review of family and patient history, a clinical interview, and a valid neuro-psychological evaluation. (Ex. 65, ¶ 11.) She then discussed petitioner's family history, repeating much of the information contained in Dr. Woods's declaration. She concluded that, "[f]amily records and reports of relatives suggest impaired psychological functioning in several members of Mr. Williams' family." (Ex. 65, ¶ 14.)

Dr. Froming noted several relevant aspects of petitioner's background and childhood including, a childhood seizure; several childhood head injuries; glue-sniffing; abuse of PCP, LSD, and steroids; a gunshot wound in the legs; and the death of his grandmother. (Ex. 65, ¶¶ 17–26.)

Dr. Froming stated that the psychological testing revealed localized frontal lobe and lateralized right hemisphere brain damage. Petitioner exhibited a substantial

split between verbal IQ (100) and performance IQ (83) which suggested right hemisphere impairment. (Ex. 65, ¶ 40.)

Dr. Froming concluded that the family history of mental illness, seizures, head injuries, and drug abuse "strongly point toward underlying mental disorders including paranoia, major depression, and a biological affective disorder of long-standing duration, pre-dating his current confinement." (Ex. 65, ¶ 47.) Dr. Froming opined that these factors caused petitioner to act impulsively during times of stress, and that the brain damage impaired his ability to plan, reflect, deliberate, and carry out preconceived plans. She stated that, under the influence of drugs, the effects of the brain damage on his behavior intensified and exaggerated the deficits in these areas. (Ex. 65, ¶ 48.)

Finally, Dr. Froming concluded that as a result of the factors discussed above, petitioner was unable to control his behavior or conform his conduct to the requirements of the law.

### Dr. Alfred Coodley

Dr. Coodley was appointed by the state court to interview petitioner and determine whether he was insane at the time of the crimes and whether he was competent to stand trial. Dr. Coodley interviewed petitioner and prepared a report in which he concluded that petitioner "is presently able to understand the nature and purpose of the proceedings against him. He is presently able to cooperate in a relatively rational manner with counsel in presenting a defense." However, Dr. Coodley noted that petitioner seemed paranoid, that he was not competent to represent himself, and suggested that further psychometric testing be carried out. (CT 378.)

Dr. Coodley also prepared a declaration in 1995 discussing his assessment of petitioner. Much of the declaration is a summary of the report he provided to the state superior court. However, habeas counsel provided him with additional information regarding petitioner's background before he prepared the 1995 declaration. He asserted that the information about petitioner's drug use and brain damage, had it been brought to his attention in 1979, would have cast his findings in a different light. He stated, "I would have advised the court that Mr. Williams was quite possibly insane at the time of the offense and that, in any case, the initial evidence was substantial enough to warrant further observation and investigation." (Ex. 64, ¶ 21.) He also stated that, "[t]he documents I have recently reviewed confirm that Mr. Williams may well have been an individual whose mental capacity was definitely diminished." (Ex. 64, ¶ 23.) Finally, Dr. Coodley stated that, "because of the testing results and the multiple declarations regarding his past behavior, I feel there is a significant question as to his capacity to form the intent to kill under any circumstances." (Ex. 64, ¶ 24.)

### Dr. Michael Coburn

Dr. Coburn was also appointed by the trial court to determine if petitioner was insane and whether he was competent to be tried. Dr. Coburn stated that he did not have sufficient data to arrive at a conclusion regarding petitioner's mental state because he was uncooperative during their interview. However, Dr. Coburn stated that there was nothing in the materials given to him which provided a basis for a diminished capacity or insanity defense. (CT 382.)

Petitioner's federal habeas attorneys provided Dr. Coburn with additional information regarding petitioner's family and medical history, Dr. Froming's test results, and other information regarding his mental health. Dr. Coburn prepared a declaration in which he essentially repeated the information contained in Dr. Woods and Dr. Froming's declarations. Dr. Coburn stated that the accounts of petitioner's family and friends describe symptoms of depression and hypomania. (Ex. 62, ¶ 14.) He stated that the new information raised questions about petitioner's mental state at the time of the crimes and his competence to stand trial. Dr. Coburn would have

joined Dr. Coodley's recommendation for additional psychological testing.

## 2. Rebuttal or Cross–Examination Evidence

The following is a summary of the evidence the prosecution could have introduced either by cross-examining petitioner's experts or calling their own mental health experts.

### a. *Cross–Examination*

#### Dr. Woods

Respondent cross-examined Dr. Woods in a deposition as ordered by the Court.

Dr. Woods testified that he has conducted approximately 30 examinations of death row inmates. He was retained by the defense for all of these examinations.

Respondent attacked Dr. Woods's diagnosis of Bipolar Mood Disorder. Respondent noted that, of all the experts retained in this case, only Dr. Woods diagnosed petitioner as suffering from Bipolar Disorder. Second, one of the criteria in the Diagnostic and Statistical Manual, Fourth Edition ("DSM–IV") for a diagnosis of Bipolar Disorder is a manic or hypomanic episode. The manic episode must last at least a week and the hypomanic period must last at least four days. (Woods Dep. at 27–28.) This requirement is designed to prevent a Bipolar Disorder diagnosis based on a brief, isolated incident. In his declaration, Dr. Woods noted several examples of what he characterized as manic or hypomanic episodes. Respondent questioned whether any of the examples lasted long enough to be properly considered. Respondent characterized the episodes as separate and brief episodes of bizarre behavior. Dr. Woods responded that he was looking for a "mood" which lasted for at least a week rather than a specific incident. (Woods Dep. at 34–35.) However, without additional information, it was difficult for Dr. Woods to determine if a manic or hypomanic episode occurred. (Woods Dep. at 25.)

Respondent also questioned Dr. Woods about his failure to diagnose petitioner as suffering from Antisocial Personality Disorder. Dr. Woods acknowledged that petitioner met many of the criteria for such a diagnosis, but that one was missing—a conduct disorder before the age of 15. (Woods Dep. at 42–43.) A conduct disorder exists where an individual manifests repeated instances of misconduct or antisocial or criminal behavior at or before the age of 15. (See DSM–IV at 90–91.) Dr. Woods testified that petitioner did not have a conduct disorder before the age of 15, therefore, he could not be diagnosed with Antisocial Personality Disorder. Respondent argued that there were many signs of a conduct disorder: petitioner ditched school and was expelled, he threw rocks at cars, and he was involved in fights. (Woods Dep. at 44–50.)

Respondent also questioned Dr. Woods about his failure to properly consider the evidence presented at trial regarding the circumstances of the 7–Eleven murder. Dr. Woods acknowledged that, if the witnesses were telling the absolute truth, their testimony might raise concerns about his diagnosis. (Woods Dep. at 84.) However, he discounted the testimony of the prosecution's witnesses because they had strong motives to lie. (Woods Dep. at 87–88.)

#### Dr. Froming

Respondent cross-examined Dr. Froming by deposition. She testified that she has conducted approximately 45 examinations of death row inmates and was retained by the defense for all of them.

Respondent's questioning focused on Dr. Froming's failure to state in her declaration that petitioner scored within normal ranges on many of the tests administered by her and that he scored above average on several tests. For instance, petitioner scored above the norm on the Tactual Performance Measure, Spatial Relations Test, Sensory–Perceptual Test, Finger–Tapping Test, and Thurstone Word Fluency Test. In fact, petitioner showed impairment on only two subtests of the Halstead–Reitan Battery—the Speech Perception Test and the Category Test. (Froming Dep. at 56.)

Respondent questioned Dr. Froming about petitioner's IQ score. She acknowledged that a score of 83 on the performance IQ test was not by itself indicative of impairment. However, the split between the performance and verbal IQ was evidence of brain impairment. (Froming Dep. at 87–88.)

Dr. Froming stated that there was a difference between petitioner's ability to express himself verbally and his ability, under the influence of PCP, "to not be psychotic and act in terms of his own internal states, and then in combination with brain injury to resist both his internal impulses, external impulses, it's just a very complicated situation, and when you're brain injured you can't always do that." (Froming Dep. at 96–97.)

### Dr. Coodley

Respondent also cross-examined Dr. Coodley by deposition. Respondent's attorney questioned Dr. Coodley about his interview with petitioner and the various statements he made in the 1979 report and 1995 declaration. Dr. Coodley testified that he did not obtain all of the relevant information regarding petitioner's background and family history and that he did not include some relevant material in his report to the trial court. He testified that he believed petitioner was suffering from a mental disease or defect which was exacerbated by drug abuse at the time of the offenses.

Respondent questioned Dr. Coodley regarding several aspects of his initial report. In that report, Dr. Coodley stated that additional psychometric testing should be done. Petitioner has used this statement to argue that Ingber should have been alerted that his mental state was an issue and that further investigation was needed. However, psychometric testing refers to testing for intellectual capacity. Dr. Coodley did not suggest that additional psychological testing—which tests for mental illness—should have been conducted. (Coodley Dep. at 63.) He recommended psychometric testing because he believed that petitioner's intellectual capacity was below average.

As in his declaration, Dr. Coodley was unable to unequivocally state during the deposition that petitioner was insane or suffered from diminished capacity at the time of the offenses. For example, respondent's attorney asked Dr. Coodley, "Are you absolutely certain that Mr. Williams was insane at the time of the offense?" Dr. Coodley responded, "I'm not absolutely certain, but I think based on all of the evidence that I have and all of the material that I have assimilated, that there was indication of mental illness at the time of the commission of the alleged offense." (Coodley Dep. at 80.)

Dr. Coodley diagnosed petitioner as suffering from Schizo–Affective Disorder. He felt that Bipolar Disorder was an incorrect diagnosis because he did not see any indications of manic behavior. (Coodley Dep. at 86–87.) He also testified that petitioner did not suffer from Antisocial Personality Disorder because he saw no evidence of a conduct disorder before the age of 15. (Coodley Dep. at 93–94.)

### Dr. Coburn

Dr. Coburn was not deposed by respondent. The parties agreed that respondent could serve interrogatories on Dr. Coburn regarding his assessment of petitioner. However, it appears that no interrogatories were served on Dr. Coburn. Therefore, the Court has no evidence regarding what cross-examination or impeachment evidence the prosecution could have presented to attack Dr. Coburn's testimony.

#### b. Rebuttal

If petitioner presented the testimony of mental health experts, the prosecution could have presented testimony by their own experts regarding petitioner's mental state at the time of the murders. The following is a summary of the opinions of respondent's experts.

### Dr. Michael Maloney

Dr. Maloney is a psychologist. He interviewed petitioner at San Quentin in 1998 and conducted many of the same psychological tests conducted by Dr. Froming.

Dr. Maloney's initial impression of petitioner was that his verbal expressive ability was above average and he exhibited "no obvious impairment in cognitive functions other than a possible mild memory deficient." (Ex. J to Respondent's Direct, ¶ 14.)

Dr. Maloney discussed petitioner's performance on many of the tests. As a general rule, petitioner tended to do well on the verbal tests but not as well on the non-verbal tests that rely on spatial visualization and visual organization. He also noted the discrepancy between petitioner's verbal and performance IQ. (Ex. J to Respondent's Direct, ¶ 27.)

Dr. Maloney conceded that petitioner performed below average on many tests. He concluded that petitioner has a memory deficit which is mild and limited to immediate verbal/auditory data. He noted that petitioner "seems to present with some deficits in certain areas of cognitive functioning," but he concluded that the evidence would not suggest deficits that would have impaired petitioner's ability to appreciate the basic nature or impact of his behavior. (Ex. J to Respondent's Direct, ¶ 46.)

Dr. Maloney also administered several personality tests. Petitioner's scores on one test were consistent with an individual who is "somewhat self-indulgent, narcissistic and demanding on others for attention and sympathy." Diagnoses of patients with this type of profile tend to be evenly split between personality disorders with passive-aggressive tendencies and schizophrenia (paranoid type). (Ex. J to Respondent's Direct, ¶ 50.) However, Dr. Maloney saw no data to suggest that petitioner has a psychotic disturbance such as schizophrenia. Dr. Maloney described petitioner's profile as "a possible personality disorder with mixed features including antisocial traits." (Ex. J to Respondent's Direct, ¶ 61.)

Dr. Maloney saw no evidence of any brain damage or other mental defect severe enough to compromise petitioner's capacity to form the intent to kill or compromise his ability to conform his conduct to the requirements of the law. (Ex. J to Respondent's Direct, ¶ 63.)

*Dr. Ronald Markman*

Dr. Markman is a psychiatrist. He interviewed petitioner and reviewed documents relating to his background and the facts of the case.

Dr. Markman concluded that petitioner did not suffer from either an organic mental disorder or any other functional mental condition that would have impaired his thinking process at the time of the crimes. (Ex. K to Respondent's Direct, ¶ 27.) Instead, Dr. Markman diagnosed petitioner as suffering from Antisocial Personality Disorder. He saw no signs or symptoms of Bipolar Disorder.

Dr. Markman recognized that his assessment of petitioner's mental state at the time of the crimes might be different if petitioner was in an altered state of consciousness secondary to on-going substance abuse at the time of the crimes. (Ex. J to Respondent's Direct, ¶ 28.) However, he concluded that the goal-directed, purposeful nature of the crime strongly suggests that the perpetrator was capable of pre-meditating, deliberating, and harboring malice aforethought. To support this conclusion, he pointed to the manner in which the victims were chosen, the planning in terms of the times and locations of the crime scenes, and the methodical way in which potentially incriminating evidence was removed from the scene. (Ex. J to Respondent's Direct, ¶ 30.)

*Dr. Reese Jones*

Dr. Jones is a psychiatrist specializing in clinical psycho-pharmacology. He did not interview petitioner, but he did review an extensive amount of documentation relat-

ing to petitioner and his crimes. In rendering his opinions, Dr. Jones assumed that petitioner shared in the smoking of one or more cigarettes containing PCP on the night of the 7–Eleven murder. However, he concluded that petitioner "did not behave or act as if he was significantly intoxicated or incapacitated by PCP or other psychoactive drugs" at the time of the crimes. (Ex. H to Respondent's Direct, ¶ 13.)

Dr. Jones noted that there is no evidence available which would absolutely document the fact that petitioner was using PCP or other drugs at any particular dose or dose schedule around the time of the murders. Therefore, "[c]onclusions about actual effects of drugs on Mr. Williams can only be drawn by considering his behavior." Dr. Jones concluded after considering the evidence concerning petitioner's behavior on the nights of the murders that he "had sufficient mental faculties and mental ability to weigh consequences, to plan a course of action, to carry out actions aimed at achieving specific goals." (Ex. H to Respondent's Direct, ¶ 14 .)

Dr. Jones saw no evidence from the documents given to him ·that petitioner "suffered from a drug-induced psychosis, from a break with reality, from fragmented ideas, from a disorganized mind, from erratic responses to stimuli, nor did it appear he was incoherent and disordered from taking PCP or other drugs on the nights of the 7–11 and Brookhaven motel robberies and murders." Instead, Dr. Jones noted that the facts of the crimes indicated that some planning preceded them. For example, petitioner did not rob the first liquor store he went to, but instead went to the 7–Eleven where Owens was the only employee, and "[t]here was selection of an appropriate time to most successfully commit a robbery (early morning)." (Ex. H to Respondent's Direct, ¶ 17.)

Dr. Jones also noted the absence of "the sometimes difficult to understand assaultive and rage-like behavior that can be associated with PCP-induced psychotic states." Instead, the crimes were consistent with a planned elimination of witnesses and the removal of incriminating evidence. A video monitor was also shot out. The victims did not provoke any aggression, petitioner fled quickly after obtaining money from the robberies, and his subsequent conversations regarding the murders indicated full awareness of his actions. Dr. Jones concluded that such reflected consideration was inconsistent with someone in a confused drug-induced state who "might more commonly act more thoughtlessly and randomly in selection of victims and appear less mindful about his own well being." (Ex. H to Respondent's Direct, ¶ 18.)

Dr. Jones found little evidence to support the conclusion that petitioner was brain damaged and stated that there was little credible evidence to support the conclusion that drug abuse exacerbated a preexisting mental dysfunction. (Ex. H to Respondent's Direct, ¶ 21.)

Dr. Jones discussed the development and the effects of PCP. He noted that the effects of PCP are variable for several reasons including, manufacturing variations in illicit chemical laboratories and the tolerance of the user based on repeated exposure. (Ex: J to Respondent's Direct, ¶ 26.)

### 3. Evidence Which Could Have Been Elicited by Petitioner on Cross–Examination

*Dr. Maloney*

Petitioner cross-examined Dr. Maloney by deposition. He testified that petitioner exhibited signs of deficits in several areas of mental functioning, including memory, perceptual organization, and visual organization. (Maloney Dep. at 17–18.)

Dr. Maloney conceded that the results of the psychological tests could indicate right hemisphere damage, including the elevated verbal compared to performance IQ; the elevated verbal conceptual index compared to the perceptual organizational index; the

low scores on the Picture Completion and Block Design tests; and the low left-hand performance in the Finger–Tapping test. (Maloney Dep. at 18, 24–25, 38.) However, he saw no evidence of a psychotic disorder. (Maloney Dep. at 47.) Dr. Maloney also testified that petitioner's profile was not consistent with Antisocial Personality Disorder.

*Dr. Markman*

Petitioner cross-examined Dr. Markman by deposition. In the deposition, petitioner's attorney focused on tangential matters. He attempted to portray Dr. Markman as a racist who was motivated by hostility towards African–Americans. (Markman Dep. at 14–17.) Petitioner's counsel spent much of the deposition trying to get Dr. Markman to admit that the prosecution's witnesses had motives to lie, therefore, they should not be relied on to provide an accurate description of the crimes. (Markman Dep. at 42–48.)

Dr. Markman acknowledged that petitioner's verbal/performance IQ split was not what one would normally see in a person with Antisocial Personality Disorder. (Markman Dep. at 30.)

*Dr. Jones*

Petitioner also cross-examined Dr. Jones by deposition. Dr. Jones testified that he had never testified for the defense in a criminal case.

Petitioner's attorney spent most of the deposition trying to get Dr. Jones to admit that the prosecution's witnesses were biased and had stronger motives to lie or distort the truth than the witnesses who provided declarations in support of the habeas claims. Dr. Jones conceded that the prosecution witnesses had motives to lie and he took that into consideration in forming his opinions. He also recognized that the memories of petitioner's witnesses could have been distorted by the desire to assist him. (Jones Dep. at 17–41.)

Dr. Jones saw no hint of schizophrenia or manic-depressive psychosis in petitioner's history. (Jones Dep. at 57.)

Dr. Jones acknowledged that he discussed acute intoxication in his declaration and that different patterns of violence are associated with chronic PCP abusers. (Jones Dep. at 48.) Chronic abusers can become more irritable and depressed, lonely or isolated.

### 4. Conclusion

After reviewing the direct testimony of the various experts, the filings by each party and the deposition transcripts, the Court finds that, on the whole, respondent's experts were more credible. Their opinions, particularly Dr. Jones's, were supported by specific facts and their conclusions were well-documented. Dr. Jones's opinion was the most credible because he cited facts to support his opinion and tied the opinion to the facts of the case.

Petitioner presented no persuasive evidence that he could not form the intent to rob or kill or that his capacity to form those mental states was substantially impaired at the time of the crimes. Although his experts opined that he suffers from some organic brain damage and some mental impairment, they failed to make a connection between the brain damage and/or Bipolar Disorder and the commission of four murders. Petitioner's experts did not adequately explain the effect of his impairments on his thoughts or actions, and failed to adequately explain how he could appear lucid during the crimes yet be unable to form the intent to kill.

Dr. Jones's conclusion that petitioner's behavior on the night of the 7–Eleven murder was inconsistent with someone who was grossly intoxicated is persuasive. Petitioner chose to rob a deserted 7–Eleven with only one employee in the middle of the night when there would be few, if any, customers. He carried a sawed-off shotgun which could be concealed in the coat he was wearing. He shot out a video monitor which might have recorded the crime. The victim was marched into a back room, made to get on his hands and knees, and shot. He offered no resistance.

Petitioner then picked up two of the expended shotgun shells to eliminate incriminating evidence. He later threw the coat he was wearing out a car window when he saw a police car and told one of his accomplices that he killed the victim to eliminate him as a witness. As to the Brookhaven Motel murder, petitioner again committed the crime at 5:00 a.m. when activity was low and there would be few witnesses. He broke down a door, shot three people, located and obtained money from a cash register, retrieved several shotgun shells, and fled in a matter of minutes. These are not the actions of an individual who is so intoxicated and mentally impaired that he cannot form the intent to rob or kill or conform his conduct to the requirements of the law.

Dr. Jones was also correct when he stated that it is impossible to determine petitioner's level of intoxication on the nights of the murders. Evidence was presented that petitioner smoked PCP before the 7–Eleven murder, but it is impossible to determine how much he smoked, the strength of the PCP ingested, and how the PCP affected him given his level of tolerance. In addition, there is no evidence that petitioner ingested PCP or any other drug before the Brookhaven Motel murders. Therefore, as Ingber stated during the evidentiary hearing, it would have been difficult to present a defense based on PCP intoxication with the facts available.

Based on the evidence discussed above, the Court finds that petitioner suffered no prejudice from Ingber's failure to present a diminished capacity defense at the penalty phase. The evidence presented by petitioner was not persuasive and it could have been effectively rebutted by the prosecution. The evidence regarding petitioner's PCP use on the night of the 7–Eleven murder was inconclusive and there is no evidence that he used PCP on the night of the Brookhaven Motel murders. No connection was made between petitioner's mental impairments and the crimes. In sum, it is unlikely that the evidence presented by petitioner at the evidentiary

hearing would have effectively mitigated the senseless murders of four people, including three members of one family, for a relatively paltry sum of money. The Court finds that there is no reasonable probability that the jury would have concluded that the balance of the aggravating and mitigating evidence did not warrant the death penalty if Ingber had presented the evidence petitioner contends should have been presented.

### Conclusion

For the reasons stated above, Claims B, Q, and R are DENIED.

■ At the evidentiary hearing, the Court also denied relief on petitioner's claim that Ingber was ineffective for failing to present a mental state defense at the guilt phase (Claim D). The Court denied Claim D based on the holding of *Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 465, 142 L.Ed.2d 418 (1998). In the instant case, as in *Correll*, the mental state defense would have conflicted with the defense presented at trial. "Thus, it was within the broad range of professionally competent assistance for [trial counsel] to choose not to present psychiatric evidence which would have conflicted with the principal defense theory." *Id.* at 1411.

■ Finally, the Court DENIES relief on Claim A. In the order on respondent's motion for summary judgment/adjudication, the Court stated that, while the Court was inclined to deny relief on Claim A, the parties could explore the issue of petitioner's competency to stand trial with trial counsel. Based on trial counsel's testimony at the evidentiary hearing and the other evidence presented on Claim A, the Court finds that petitioner failed to present evidence "sufficient to positively, unequivocally, and clearly generate a real, substantial and legitimate doubt as to (his) mental capacity." *Watts v. Singletary*, 87 F.3d 1282, 1290 (11th Cir.1996) (quotation omitted). Therefore, petitioner has failed

to establish that he was incompetent to stand trial.

IT IS SO ORDERED.